UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        CRIMINAL ACTION NO. 12-CR-20267

vs.

                        DISTRICT JUDGE NANCY G. EDMUNDS

                        MAGISTRATE JUDGE MONA K. MAJZOUB

D-2 CHECAROL ROBINSON,

        Defendant.
_____/

**REPORT AND RECOMMENDATION DETERMINING THE AMOUNT OF LOSS FOR PURPOSES OF CALCULATING DEFENDANT'S OFFENSE LEVEL**

On August 2, 2012, Defendant Checarol Robinson pled guilty to one count of Conspiracy to Commit Health Care Fraud and three counts of Health Care Fraud. (Docket no. 40 at 13.) On November 30, 2012, the United States provided the Court with a sentencing memorandum asking the Court to "(1) impose a sentence of 78 months in prison; (2) impose a three-year term of supervised release; and (3) order Robinson to pay restitution in the amount of $599,438.78, jointly and severally with her co-conspirator in the fraud [(Louisa Thompson)]." (Docket no. 37 at 1.) The Court referred the matter to the undersigned for purposes of an evidentiary hearing to determine the amount of loss that should be attributed to Robinson. (Docket no. 38.) The Court held an evidentiary hearing on January 28, 2013 and issues this Report and Recommendation in accordance with Eastern district of Michigan Local Rule 72.1.

**I.    RECOMMENDATION**

The Court recommends attributing a total intended loss of $2,094,500.00 and a total actual loss of $599,438.78 to Defendant Checarol Robinson.

**II.     REPORT**

    **A.     Procedural Background**

The Court will adopt the procedural background as set forth in the government's November 30, 2012 sentencing memorandum.

    **B.     Robinson's Guilty Plea**[1]

At her plea hearing on August 2, 2012, Robinson pled guilty to one count of Conspiracy to Commit Health Care Fraud and three counts of Health Care Fraud.  (Docket no. 40 at 13.) As part of her conspiracy plea, Robinson admitted that she "own[ed] group homes in the Eastern District of Michigan," that "Medicare beneficiaries reside in those homes," that she "provide[d] the beneficiaries' Medicare information to Louisa Thompson," and that Thompson "submit[ted] false claims to Medicare for psychotherapy services." (*Id.* at 14.)  Robinson also admitted that Thompson "pay[ed] [her] in order to provide those beneficiaries," and that Robinson was "aware [Thompson] was going to submit those claims;" they "were in agreement that [she] would do this." (*Id.* at 14-15.)  Additionally, Robinson admitted that she "separately owned a place called P&C Adult Day Care Center" and that "through that location, . . . [she] personally submit[ted] false Medicare claims . . . involving the same Medicare beneficiaries." (*Id.* at 15.)  "[She] and Miss Thompson [were] in agreement that [Robinson] would use [Thompson's] Medicare provider number for these services." (*Id.*)  As part of her health-care-fraud pleas, Robinson admitted that in each of the three counts, she submitted claims for individuals for "individual [or] group psychotherapy" and "in fact [the indivduals] never received the services."

---

[1]The Court addresses Robinson's plea hearing in this Report and Recommendation because there was some disagreement at the evidentiary hearing regarding the contextual substance and scope of her admissions.

## C. The Evidentiary Hearing[2]

### a. Special Agent Marc Heggemeyer's Testimony

In support of its position that Robinson should be responsible for $2,094,400.00 in intended loss, the United States called Special Agent Marc Heggemeyer to testify at the evidentiary hearing.. Heggemeyer has investigated medicare fraud for the Department of Health and Human Services for approximately two-and-a-half years; he has nine years of experience in this field. Heggemeyer testified that his investigation in the matter focused on three entities: TGW Medical, Caldwell Thompson Manor (CTM) and P&C Adult Day Center, LLC (P&C). He testified that most of the information included in his testimony was provided by Louisa Thompson but was supported by the data and documentary evidence that was collected.

After a brief explanation of how medicare billing is conducted, Heggemeyer testified that Thompson is a licensed social worker with an MPI Number; she was also the owner of TGW and CTM. He testified that each of these businesses was used to create fictitious progress notes for nonexistent patient psychotherapy sessions through what Thompson called Medical Technicians. These Medical Technicians were, in fact, unlicensed workers.

Heggemeyer testified that Robinson ran her own group homes. Robinson and Thompson met sometime in 2008 or 2009, and according to Thompson, Robinson was providing clients to TGW and wanted to know how to start her own day program. Thompson provided Robinson with the information necessary to open the program, and Robinson opened P&C. Robinson open P&C, however, in her daughter's name so that Robinson would not lose her Social Security income.[3] By

---

[2]The Court will limit its discussion of the testimony from the evidentiary hearing to that which it finds relevant for purposes of its decision herein.

[3]Robinson would later admit during her testimony that she committed this act, which the Assistant United States Attorney argued amounts to social security fraud.

the time P&C opened, TGW was closed, so P&C opened at TGW's last location; Thompson owned the building. Robinson agreed to pay Thompson rent for use of her building and an additional $800.00 bi-weekly for use of her signature on forms and for use of Thompson's MPI number. Thompson would have no ownership interest in P&C. Sometime in July or August 2010, P&C applied for its Medicare license, which was ultimately issued in February 2011. During this time, however, P&C submitted its Medicare billings through CTM.

Heggemeyer testified that Medicare payments to P&C were deposited into a bank account held by Robinson, her husband, and her daughter; the account was in P&C's name, and Thompson was not a signer. Heggemeyer reviewed the account, compared it to Medicare records, and determined that P&C had billed Medicare in the amount of $1,122,650.00 and had received payments in the amount of $278,399.18. Heggemeyer determined that the entirety of billings from P&C were fraudulent.

In support of his determination, Heggemeyer testified that he interviewed two Medical Technicians from P&C, the individual who handled the books at P&C, three beneficiaries, and Thompson; he did not interview Robinson. These Medical Technicians and the bookkeeper told him that Robinson provided the Medical Technicians with lists of names of individuals for whom they were to create fictitious records. These records were then be provided to the bookkeeper for billing purposes. Thompson provided the templates for the fictitious records based on what she did at TGW and CTM. The Medical Technicians were provided with a strict schedule for billing purposes, which included three days a week of individual therapy and five days a week of group therapy. The employees and Thompson all told Heggemeyer that Robinson provided the schedule, and she was the person who ran P&C on a day-to-day basis. The beneficiaries told Heggemeyer that they did not receive services at P&C on the dates in question.

Heggemeyer also testified that he reviewed the records for CTM, and after his conversation with Thompson, he learned that CTM billed for 43 of Robinson's purported patients between July 1, 2010, and February 2011. He testified that these individuals' billings totaled $971,850.00 and that Medicare paid out $321,039.60 on these claims. He reached the conclusion that these 43 individuals were Robinson's clients because they were the only clients shared by CTM and P&C; that is, they "moved" to P&C after it had a Medicare PIN.

On cross examination, Heggemeyer admitted that he had not interviewed all of the beneficiaries of claims made by P&C, and he had not interviewed all of the P&C employees. He had only interviewed five to ten beneficiaries out of an unknown, but presumably large, number, and he had only interviewed the two Medical Technicians and the P&C bookkeeper. He was aware that these three individuals had all been hired and provided to P&C by Thompson, and he could not say whether any other employees were hired by Thompson or Robinson. He was also unable to say whether Robinson received any payment for the 43 clients billed by CTM. Agent Heggemeyer also admitted that he could not determine whether P&C provided any legitimate services of any kind and whether Thompson had any sort of unofficial access to the P&C bank account.

      **b.**      **Robinson's Testimony**

Robinson testified that she provided two clients to CTM and that she provided them for the purpose of receiving legitimate treatment. She also testified that she received psychotherapy treatment from CTM, and that was when she met Thompson. She testified that Thompson approached her and offered to teach her how to run a legitimate day program.

Robinson testified that the P&C building was owned by Thompson, selected by Thompson, and set up by Thompson. She indicated that she paid rent to Thompson and that Thompson provided the employees and the bookkeeper. Robinson, herself, only hired one Medical Technician. She

asserted that she did not know the licensing requirements for a day program, that she did not know what licenses her employees held, and that Thompson was handling all of those matters. Robinson further testified that Thompson ran the day-to-day business at P&C; Robinson was just the owner. She stated that she was not aware of any impropriety and that when she came across a billing discrepancy, she took it to Thompson, who indicated that she would "take care of it." She also asserted that she was only at P&C two or three times a week and that Thompson would write checks that Robinson would later sign.

Robinson testified that the clients billed by CTM between July 2010 and February 2011 were P&C clients and that this was done because P&C did not have its Medicare PIN. She testified that she saw people receiving psychotherapy services at P&C and that she just gave those individuals' names to Thompson and the bookkeeper; she had no control over what happened from there. She testified that P&C made approximately $200,000.00 while it was in business and that all but 15% of that income was legitimate. Robinson also testified that Thompson told her "to go to trial" after charges were filed and that she only accepted her plea offer after Thompson agreed to testify against her.

On cross examination, Robinson argued the semantics of her guilty plea, apparently asserting that she only admitted to providing names to Thompson in exchange for money and that Thompson committed the fraud. While she did not state it clearly, it appears that Robinson was claiming that she did not get paid in exchange for helping commit the fraud; instead, she was paid for providing clients. She admitted to making personal purchases out of the P&C bank account, but she asserts that it was, in general, a business account, not a personal account. Additionally, she admitted that she and her husband went to the home of one of the witnesses in this matter, but she indicates that

she was on the phone the whole time and that her husband spoke with the witness.[4]  Robinson also admitted to writing and signing treatment notes for patients even though the was not qualified.  She claims that she did not know she was unqualified and that Thompson told her to write the note, so she did.

    **D.**    **Standard of Proof**

The burden of proof in determining sentencing guidelines issues is a preponderance of the evidence.  *United States v. Carroll*, 893 F.2d 1502, 1506 (6th Cir. 1990); *see also U.S. v. Mahaffey* 53 F.3d 128, 131 (6th Cir. 1995) (holding that "[t]he government has the burden of proving by a preponderance of the evidence the amount of drugs for which a defendant is accountable") (citing *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990); *United States v. Clemons*, 999 F.2d 154, 156 (6th Cir. 1993)).  In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court, in decreeing that the U.S. Sentencing Guidelines are advisory, further affirmed that district courts are to continue making findings of fact based upon a preponderance of the evidence.  *United States v. Yagar*, 404 F.3d. 967, 972 (6th Cir. 2005).

    **E.**    **Analysis**

Under the Sentencing Guidelines, the offense level of a defendant convicted of fraud is adjusted according to the amount of "loss" involved in the fraud. U.S.S.G. § 2B1.1(b)(1) (2009). "[L]oss is the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* "Intended loss" is "the pecuniary harm that was intended to result from the offense." *Id.*  And because Robinson pled guilty to conspiracy, conduct relevant to determining the sentencing range includes her acts and omissions,

---

[4] The United States asserts that Robinson and her husband attempted to convince this witness to attend Robinson's trial drunk or high so that he could not testify.

as well as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1)(B).

The issue before the Court, however, is whether Robinson should be held accountable for the entire $2,094,500.00 billed to Medicare by P&C and CTM. The United States argues that Robinson should be held accountable for the entire loss because both entities were entirely fraudulent; they conducted no legitimate business whatsoever. With regard to P&C, Robinson was the owner, she admitted that she committed the fraud, and she admitted to being part of the conspiracy with Thompson. Thus, she should be held accountable for all of the loss attributable to P&C billings. With regard to CTM, the United States argues that Robinson is responsible for the billings related to the beneficiaries that she referred to CTM because her actions were responsible for "the loss caused to the medicare program." Moreover, Thompson's acts were reasonably foreseeable and in furtherance of the criminal activity.

Robinson asserts that the entire scheme was created and carried out by Thompson; she only admitted to her part in the conspiracy because she was responsible for the mistakes that took place under her ownership. She contends that she should only be responsible for $5,000 - $10,000 in loss for two reasons: (1) Thompson used Robinson as a patsy to take the fall and did not tell her that the business was illegitimate; and (2) the United States has not proven by a preponderance of the evidence that all of the Medicare billings from P&C and CTM were, indeed, fraudulent.

    1.  **Robinson's knowledge**

Robinson argues that Thompson received no economic benefit from the fraudulent scheme at P&C and, therefore, Thompson must have had an ulterior motive. Robinson contends that Thompson knew that investigators would close in eventually, so she brought Robinson into the fold of her scheme, provided her with limited knowledge, and then agreed to testify against her in

exchange for a deal. This argument, however, is inapposite with Robinson's contention that Thompson took money from the P&C accounts by drafting checks that Robinson would later sign. Either Thompson received no benefit from P&C, or she did. The Court does not find this argument persuasive.

### 2. Total Losses

Robinson argues that even though the United States asserts that every single billing submitted by P&C and CTM constituted fraud, no such evidence has been presented. At most, the United States has proven that billings submitted by the individual, unlicensed Medical Technicians, billings submitted for patients treated by Robinson, and billings submitted for the three individuals included in Counts II through IV against her were fraudulent. But, Robinson argues, these billings have not been itemized, and other unproven charges have not been deducted from the claimed total. In support of this contention, Robinson argues that she was not aware of the scope of the conspiracy, and even if she was aware, "[t]he fact that the defendant is aware of the scope of the overall operation . . . is not enough to hold him accountable for the activities of the whole operation." *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002), (citing *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)).

Robinson's argument has some merit in that she should not be held accountable for the entire operation in this matter. But in asking for Robinson to be held accountable for the $2,094,500.00 in submitted billings, the United States is not asking her to be held accountable for losses attributable to Thompson alone, TGW, or for billings submitted by CTM for beneficiaries not billed on behalf of P&C. Additionally, Robinson is correct that the United States has not proven that each and every individual billing submitted to Medicare by P&C was fraudulent. Nevertheless, when itemizing loss, "once the government establishe[s] the amount of loss . . . the court [is] not required

to assume that . . . remaining undocumented expenses were . . . legitimate." *United States v. Yaker*, 87 Fed.Appx. 532, 535 (6th Cir. 2004). In *Yaker*, the court noted that "Yaker was afforded the opportunity to establish the legitimacy of the[] remaining expenses, using whatever documents he might have had in his control." (*Id.*) Likewise, while it is not her burden to disprove the allegations against her, Robinson pled guilty to the charges against her, and she was afforded the opportunity to establish the legitimacy of the remaining billings, using whatever documents she may have had in her control. She has provided no such evidence. Thus, the Court finds that the United States has met its burden and has proven by a preponderance of the evidence that the billings submitted by P&C and by CTM on behalf of P&C were fraudulent.

### III.     Conclusion

Because the Court finds that the entirety of the billings submitted by P&C and CTM were fraudulent, the Court recommends attributing a total intended loss of $2,094,500.00 and a total actual loss of $599,438.78 to Defendant Checarol Robinson.

### IV.     Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated: January 30, 2013         s/ Mona K. Majzoub
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 30, 2013         s/ Lisa C. Bartlett
                                Case Manager